JoNes, Chief Judge,
delivered the opinion of the court:
Plaintiffs’ petition was filed pursuant to House Resolution 491, 83d Congress, 2d session, which was passed on April 26, 1954, and is as follows:
Resolved, That the bill (H. R. 8063) entitled “A bill for the relief of Tom R. Hickman and Nannie Conley,” now pending in the House of Representatives, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
We adopt the following statement of facts as found by our trial commissioner, Wilson Cowen, who heard the witnesses in the locality where the property in question is located:
1. On May 14,1942, at the request of the Secretary of War, a petition for condemnation entitled “United States of America v. 58,096.6 Acres of Land, More or Less, Situated in Cooke County, Texas” was filed in the District Court of the United States for the Eastern District of Texas, Sherman Division. The purpose of the suit was to condemn the land for Camp ITowze, an Army camp which had been established in the spring of 1942. One of the tracts included in the condemnation proceeding was a tract referred to as Tract 154 containing 530.6 acres of land, which was then owned by Tom R. Hickman, W. J. Hickman, and Mrs. Nannie Conley. Notice of the filing of the petition was duly served, and on May 14,1942, the court issued an order granting the United States immediate possession of the real estate.
On September 21,1942, a Declaration of Taking was filed *382 to include Tract 154, and on the same date judgment was entered on the declaration, vesting title in fee simple to the property in the United States.
2. The case involving Tract 154 came on for hearing before special commissioners, who on June 29, 1943, awarded $12,550 for the tract. Exceptions were filed and a trial was held before a jury with Judge R. J. Williams, a retired judge of the Court of Appeals for the Tenth Circuit, sitting by assignment. On December 13, 1943, the jury returned a verdict that the value of Tract 154 was the sum of $12,469.10 as of the date of taking, and judgment was thereupon entered in that amount, together with interest thereon from May 14, 1942, at the rate of six percent per annum.
3. The defendants in the condemnation suit filed a motion for a new trial on June 23,1944. No action was taken on the motion until after February 18,1946, when the land included in Camp Iiowze was declared to be surplus to the needs of the War Department, pursuant to the Surplus Property Act (58 Stat. 765). The Farm Credit Administration was designated as the disposal agency, and plaintiffs made application to that agency for the repurchase of Tract 154, in accordance with the provisions of the Surplus Property Act, granting priority rights of repurchase to former owners. At that time, plaintiffs were informed that as long as the motion for a new trial was pending, they could not be considered as former owners under the terms of the Surplus Property Act and, therefore, that they would not be eligible to repurchase the land as former owners until the motion was withdrawn. After this advice was given, the motion for a new trial was withdrawn on May 1, 1947, by permission of the court.
The regulations for disposal of surplus agricultural land, in effect at that time, provided that the former owners would be eligible to repurchase their property at the price paid by the Government, with adjustments to reflect an increase or decrease in value resulting from action by the Government during its ownership. The amount of the judgment in the condemnation suit was $12,469.10, including $300 allowed for growing crops, or a net amount of $12,169.10. From this amount, the appraiser employed by the Farm Credit Administration made certain deductions for damages caused by the *383 Government’s use of the land and arrived at an adjusted sales price of $10,302. The appraisal did not take into consideration the quantity or value of the gravel that had been removed from the land by the Government. Upon payment of such adjusted price by the former owners, a quitclaim deed was executed pursuant to the terms of the Surplus Property Act on August 26, 1947, wherein Tract 154 was conveyed to Tom R. Hickman and wife, Tina M. Hickman, Ray Conley, Mike Conley, W. B. Conley, Rebecca Conley, Louise Conley, Mary Frances Hickman, David B. Hickman, Tom R. Hickman, Jr., Ruth Conley, Willett J. Hickman, Jr., Martha Hickman, Ruth Hickman, and Rolland Hickman. Nearly all the former owners of land condemned for Camp Howze elected to repurchase the land in accordance with the priority privileges accorded to them under the Surplus Property Act.
4. Although the appraisers employed by the Government to appraise the land at the time it was condemned were instructed to consider all elements of value in arriving at the total value of the property, none of them made any allowance for the value of the gravel on Tract 154. Some of the appraisers concluded that the gravel did not have any market value and others, who. looked at it, decided that they were not qualified to determine the extent or value of the gravel and did not consider it in their appraisals. One of these appraisals is in evidence as plaintiffs’ exhibit 2-b; it contained a notation stating “There is a gravel pit on this tract. The value of the gravel deposit has not been reflected in the land value.”
In preparation for the hearing before the special commissioners and for the trial in the District Court, the Government employed a civil engineer to make a survey of and report on the gravel pit. He found that the gravel was of a type that was suitable for road construction but not for concrete aggregate. From inquiries made in Gainesville, he came to the conclusion that there was no well-defined commercial market for the gravel. However, since he decided that the gravel had some value, he assigned a token value of $100 to it. At the trial in the District Court he testified, *384 giving bis opinion as to the demand for and value of the gravel.
5. During the trial of the condemnation suit involving Tract 154, the attorneys for the Hickmans and the other owners sought to introduce evidence of the quantity of gravel that had been removed by the Army after the petition in condemnation was filed, and also attempted to prove the value of the gravel. The presiding judge refused to admit this evidence and also excluded evidence offered by the defendants in that action as to the value of the gravel and minerals separately from the value of the land as agricultural land. However, witnesses for both parties, including the Government appraisers, testified as to the value of the tract as a whole, and the court charged the jury to take into consideration all elements of value in arriving at their verdict. The evidence at the trial was not reported or transcribed by a court reporter and there are some conflicts in the evidence as to the testimony and proceedings during the trial in the District Court, but the evidence as a whole leads to the conclusion that the verdict of the jury and the judgment of the court did not include nor allow anything for the value of the gravel deposit.
6. A gravel pit had been opened in the southeast corner of Tract 154 and on the west side of the Gainesville and Sivells Bend Koad prior to 1903, when the parents of Tom E. Hickman purchased the land. From time to time the county commissioners obtained gravel from the pit for the purpose of graveling the Sivells Bend Eoad. After the death of his parents, Tom E. Hickman and his brother assumed control of the land, and on various occasions they sold small quantities of gravel from the pit for use on county roads. A few years prior to the establishment of Camp Howze, the Hick-mans sold some gravel from the pit at a price of 15 cents per yard. The evidence does not show the extent of the gravel sold prior to the time the land was taken, but it does establish that the pit was located in an area where there was a plentiful supply of such gravel and that the demand for the gravel was not sufficient to require more than the development of a relatively small portion of the total gravel deposit. *385 On May 14, 1942, when the land was taken, the gravel pit covered an area of only one-half acre.
7. The construction of facilities and roads at Camp Howze began diming April or May 1942, and thereafter large quantities of gravel were excavated and hauled from the pit on Tract 154 by Government contractors for the construction and maintenance of roads and parking areas within the camp area. On some occasions, as many as 48 trucks were engaged in hauling gravel from the pit to various locations within the camp.
During the period from May 17 to May 25,1942, after the order of immediate possession had been issued, plaintiffs sold 291 cubic yards of gravel from the pit at a price of $1.35 per cubic yard, delivered to contractors who were engaged in the construction of Camp Howze. It cost plaintiffs $1.00 per yard to get the gravel delivered so that their net profit per yard amounted to 35 cents. The records of the contractors who hauled gravel from the pit for use at Camp Howze during 1942 and 1943 have been destroyed, and it is impossible to establish the exact quantity which was excavated and used by the Government. However, a tabulation was kept of the quantity of gravel hauled during the period from October 4, 1942, to November 21, 1942, and the tabulation shows that the Government contractors excavated and used 48,984 cubic yards from the pit on Tract 154 during that period. The evidence is undisputed that a considerable quantity of gravel was removed by the contractors prior to October 4,1942, and that the Government was still excavating and using gravel from the same pit as late as April 8, 1943. During the period of Government ownership of Tract 154, the gravel deposit thereon was developed and exploited to the extent that all of the gravel which could be excavated and loaded with steam shovels or similar equipment was removed from the pit. At the time the land was reconveyed to plaintiffs, the gravel pit covered an area of approximately five acres. No gravel has since been sold by plaintiffs, because there is no demand for gravel that must be excavated and loaded by hand.
8. Prior to the trial of the suit in this court, engineers employed by both parties surveyed the pit in an effort to deter *386 mine the amount of gravel that had been removed from the pit. It was impossible to make an exact calculation, because the original ground elevations were not available. Although the evidence does not establish.the exact quantity of gravel removed from the pit by the defendant during its ownership of Tract 154, the evidence is sufficient to show, with reasonable accuracy, that the quantity so removed by defendant was TO,000 cubic yards.
9. The City of Gainesville and Tract 154 are located within the Wichita Falls District of the Highway Department of the State of Texas. During the period from 1935 to the present, there has been an increasing demand by the State Highway Department in the Wichita Falls District for road gravel for use in the construction of and maintenance of State highways and farm-to-market roads. In 1942, at or about the time Tract 154 was taken, the Wichita Falls District of the State Highway Department customarily paid a price of 10 cents per cubic yard for road gravel in the pit. Although this price was more or less fixed, there were some instances where competitive conditions permitted the State Highway Department to obtain gravel at a price of five cents per cubic yard. The evidence establishes that the fair and reasonable value of the gravel on Tract 154 at the time the land was taken was five cents per cubic yard.
RECOMMENDATION
It will be noted that the district judge, before whom the case was tried, refused to permit the introduction of evidence as to the value of the gravel in connection with the finding of the value of the land taken; and the appraisers in valuing the land for resale to the plaintiff gave no consideration to the amount or the value of the gravel taken by the Government while it was in possession of the land.
The plaintiffs claim that at least 100,000 cubic yards of gravel were taken by the Government. The amount is in dispute, but the evidence clearly shows that at least 70,000 cubic yards were thus taken from the 530.6 acres of land owned by the plaintiffs. The fair and reasonable value of the gravel taken by the Government was 5 cents per cubic yard.
*387 Since it was a part of the corpus of the property and was neither considered in valuing the land originally taken nor in valuing the land for resale, the plaintiffs are morally entitled to recover the sum of $3,500. Mississippi and Rum River Boom Co. v. Patterson, 98 U. S. 403; United States v. Foster, 131 F. 2d 3.
It is doubtful whether there is a strictly legal basis of recovery, but there is certainly a moral obligation to compensate plaintiffs for the value of the gravel taken and used by the Government. Gay Street Corporation v. United States, 130 C. Cls. 341.
We recommend that plaintiffs be paid the sum of $3,500, with interest at the rate of 4 percent per annum, from May 14,1942, to the date of payment, not as interest but as a part of just compensation.
This opinion and the findings of fact, with the conclusions therein, will be certified to the Congress pursuant to House Kesolution 491, 83d Congress, 2d Session.
Laramoke, Judge; MaddeN, Judge; Whitaker, Judge; and Littleton, Judge, concur.